CHIEF JUSTICE GRAY,
dissenting.
¶166 I respectfully dissent from the Court’s opinion. I agree with part-but not all-of Justice Rice’s dissent, and feel compelled to comment on several matters.
¶167 Most basically and most importantly, it is critical to remember that this case is before us on appeal from a decision entered by the First Judicial District Court, Lewis and Clark County. It is not an original proceeding in this Court. The issue, therefore, is not as stated by the Court. The issue is whether the District Court erred in granting the University System’s motion to dismiss. Other than several passing references to the District Court’s granting of that motion and a statement that the District Court erred-on the basis of an issue not presented to it-in the first step of its equal protection analysis, even a brief reading of the Court’s opinion clarifies that it has totally ignored the District Court’s legal analysis of the issues presented to it by the parties. One can only speculate about why the Court has chosen to do so.
¶168 The fact remains that the Court resolves the present case, and reverses the trial court, on the basis of an issue not presented to the trial court. Our cases holding that we do not consider new issues-or changed theories-on appeal are so legion as to require no citation to authority. The reason is mentioned above: as a reviewing Court, it is fundamentally unfair for us to reverse a district court on the basis of arguments not presented to it. In addition, of course, doing so essentially makes this Court the court of first-rather than last-resort in an appeal. The Court’s statement that we may address the issue because the parties briefed it totally misses the essence of our “will not *203 consider” rule, which focuses not on what the parties argue, but on this Court’s proper role as a reviewing court. Absent a reasoned and correct legal analysis by this Court establishing some error of law in the District Court’s resolution of the case before it, I would affirm that court. Because the Court addresses the new issue, however, I feel compelled to respond.
¶169 I disagree strongly with the Court’s discussion and analysis of common law marriage, which is the basis on which it determines that this is a case about unmarried opposite-sex couples versus unmarried same-sex couples, rather than about married couples versus non-married couples. Indeed, the inherent flaw-both logically and legally-in both appellants’ arguments and the Court’s opinion can be seen early on when the Court relates that the appellant couples “consider themselves married and hold themselves out to their families and their community as a couple in a committed, marital relationship.” There is no question that these couples consider themselves married in their hearts and souls; nor do I doubt for a moment that they hold themselves out as such and, hopefully, are accepted as such in the hearts of their communities. The problem is that Montana does not recognize same-sex marriages. Under the law-whether we like it or not-these couples are not eligible for marriage in the state of Montana whether by solemnization, declaration or common law. I cannot join in the Court’s creation of the artificial construct of “unmarried opposite-sex and unmarried same-sex couples” for purposes of resolving this appeal.
¶170 I do join the Court in acknowledging the extraordinary number of amici curiae who appeared in this case. Our legal analyses are often illuminated by such amici, which is as it should be. Indeed, the facts set forth by the Court from amicus Northwest Women’s Law Center regarding the numerous entities which have allowed same-sex domestic partners to qualify for benefits are interesting and, perhaps, indicative of a trend. These facts, however, are of no relevance to the legal issues before us. That many may choose to provide such benefits to same-sex domestic partners bears no relationship to the legal question of whether the law requires such an action. Indeed, I wonder whether all of the amici siding with the appellants in the present case have chosen to provide health benefits to same-sex domestic partners. The fact remains, contrary to the Court’s “restatement” of the University System’s policy, that by its terms the policy permits all University System employees who have spouses recognized by Montana law-whether via solemnization, declaration or common law-to purchase health benefits for their marital partners. Thus, I trun briefly to the Court’s discussion of the University System’s Affidavit.
*204 ¶ 171 The University System’s Affidavit of Common-Law Marriage is a sworn statement by couples eligible for marriage under Montana law. When sworn and subscribed to, and duly notarized, it is a clear statement that the couple has-since a past date-lived together as husband and wife and taken on the responsibilities and duties of marriage. The Court apparently believes University System employees will swear to untruths. I cannot join the Court in such an unsupported perception of University System employees.
¶172 The Court also cites to a law review article on the subject of the continued viability of common law marriage (a proposition unrelated to the present case) which observes that no jurisdiction permits a statement of future intent to create a common law marriage. While the observation is undoubtedly true, the Affidavit at issue here is not a statement of future intent, as discussed above. The Court goes on to interpret the Affidavit as being one by a couple “who declines to sign a statutory written declaration.” Such a negative connotation is totally unwarranted in a state which recognizes common law marriage. The fact is that the sworn Affidavit used by the University System evidences that the couple has married under the common law. Most assuredly, the Affidavit does not create the marriage. In my view, however, the Affidavit is not reasonably susceptible to a determination by this Court that the sworn statements are made by those who “may not choose to marry at all, but rather may choose to sign a document in order to receive employment benefits.” Not surprisingly, nothing of record supports such a determination.
¶173 Nor does the Court’s statement that we are “not aware of any Montana ‘case’ in which a common law marriage has been established without one of the parties involved in the relationship using extrinsic evidence to prove” the existence of the elements of a common law marriage advance its theory in any substantive way. That this Court sees very few cases involving common law marriage does not mean there are not thousands of such marriages in Montana which never require a court determination regarding the marriage at all, even on the death of one of the spouses. Moreover, I daresay that district courts across the state have conducted any number of dissolution proceedings involving spouses in a common law marriage where the validity of the marriage never arises and need not be determined. I personally know of a situation in which a common law marriage was dissolved in the usual way under the laws applicable to the dissolution of marriages, without any issue being raised-or resolved by the trial court-about the existence of the common law marriage. It is disingenuous for this Court to rely on a mere lack of “awareness” of any common law marriage *205 “case” not involving extrinsic evidence while ignoring the certainty that the issue of the existence of a common law marriage thankfully does not always result in litigation at all, much less litigation which makes its way to this Court.
¶174 For equal protection purposes, and notwithstanding the Court’s statement to the contrary, there is nothing “illusory” about the marital versus non-marital nature of the University System’s policy. Indeed, the appellants argued in the District Court, and argue here, a marital versus non-marital classification. The classes created by the policy are based entirely on the kinds of marriages recognized by Montana law, not sexual orientation. For purposes of this case, the difference between the “classes” is that one class involves a spouse in a legally recognized marital relationship and the other class involves a committed partner in a relationship which under current Montana law does not-and cannot-constitute a marriage in any legal sense. Thus, the present case is readily distinguishable from both the Court’s and former Chief Justice Tumage’s opinions in Gryczan, which did not involve a marital classification. Moreover, expressly unlike the present case, Gryczan presented a challenge to the constitutionality of a statute criminalizing sexual acts between same-sex people. Here, we all agree the appellants are not directly challenging Montana’s laws relating to the definition of marriage. For those reasons, I submit Gryczan has no application here.
¶ 175 With regard to the Court’s statement that it is unconvinced the policy at issue is justified based on administrative efficiency, surely the Court cannot mean administrative efficiency is not a legitimate governmental interest. Perhaps the Court merely means that it disagrees the policy advances administrative efficiency. If so, I suggest that this Court is not in a position to make such a determination for the University System; nor could we properly conclude that a marital versus non-marital classification is not a rational means of making health benefits available to “dependents” of University System employees. “Rational” does not equate to what this Court might have chosen to do.
¶ 176 In any event, it is true-as the Court states-that the University System could adopt other policies. Those policies conceivably could make health benefits available to any and all individuals chosen by University System employees. They conceivably could exclude health benefits for any spouses or children of University System employees. But the issue here is whether the policy actually adopted by the University System denies equal protection of the law. In my view, it does not, at least as discussed and resolved by the Court.
¶177 It is difficult to close without addressing, in some way, Justice *206 Nelson’s passionate and scholarly concurring opinion which correctly notes the historic discrimination against gay and lesbian citizens, cites to much sociological and academic literature and other materials, and provides a number of analytical approaches based on various articles and books. We all have passions that run deep and strong, and the nice thing about either authoring or responding to a concurring opinion is that one is more free to express her/himself outside the strictures that generally apply to a Court opinion. For myself, however, the closer I stay to the law and away from personal passions, the better I perform this very difficult job. Moreover, concurring opinions and responses thereto sometimes are viewed by others-whether intended by the author or not-as taking positions in advance on matters that need not be addressed in the context of the present case. Again, for myself, I would rather await a case or controversy presenting a clear issue, based on a record, which necessarily requires resolution of an issue.
¶178 In sum, I dissent from the Court’s opinion and, since no error is established by the Court in the District Court’s resolution of the issues before it, I would affirm the District Court.